# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

TONDA COLLIER-SUMRAIN,

        Plaintiff,

v.
                **MEMORANDUM OF LAW & ORDER**
                Civil File No. 12-2466 (MJD/FLN)

TRANE U.S., INC.,

        Defendant.

Clayton D. Halunen, Barbara Jean Felt, and Ross D. Stadheim, Halunen & Associates, Counsel for Plaintiff.

David J. Duddleston and Sara G. Sidwell, Jackson Lewis P.C., Counsel for Defendant.

## I.  INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment.  [Docket No. 10]  The Court heard oral argument on November 14, 2013.  For the reasons that follow, the Court grants in part and denies in part Defendant's motion.

## II.  BACKGROUND

### A.  Factual Background

1.     **The Parties**

Defendant Trane U.S., Inc. ("Trane") provides heating, ventilating, and air

conditioning systems and building management systems and controls.  (Watson

Decl. ¶ 3.)  Trane has approximately 29,000 employees at 104 manufacturing

locations in 28 countries.  (<u>Id.</u> ¶ 4.)  It has offices in St. Paul, Minnesota, and La

Crosse, Wisconsin.  (<u>Id.</u>)  Trane became a subsidiary of Ingersoll Rand, a global,

diversified industrial corporation, in 2008.  (Blase Decl. ¶ 4.)  Ingersoll Rand's

U.S. headquarters are in Davidson, North Carolina.  (<u>Id.</u>)

In June 2008, Plaintiff Tonda Collier-Sumrain ("Collier"), age 40, was hired

by Trane at its St. Paul location as a supply chain business analyst in Trane's

Integrated Supply Chain ("ISC") Financial Planning and Analysis ("FP&A")

group.  (Collier Dep. 44-45, 50, 172-73.)  She has a bachelor of science degree in

accounting and had worked in corporate finance at 3M, Best Buy, and Land

O'Lakes.  (<u>Id.</u> 13-14.)

2.     **Collier's Employment with Trane**

Collier's primary job duties included interpreting data for the supply chain

with respect to productivity, labor, materials inflation, headquarters expense

analysis, budget planning, and forecasting.  (Collier Dep. 49.)  According to

Trane, the specific job duties and responsibilities of its financial analysts differ

from business unit (stream) to business unit.  (Watson Dep. 43-47.)  Initially, the

only other financial analyst on Collier's team was financial analyst Chris

Marietta.  (Collier Dep. 50-51.)  Both Collier and Marietta reported to supervisor

Joe Schmitz.  (Id. 50, 55.)

In March 2009, Marietta left Trane and 42-year-old Susan Schaaf[1] was

hired to replace her.  (Collier Dep. 58; Schaaf Dep. 9.)  During that time, Schmitz

left his position, and April Wehling became Collier's supervisor.  (Collier Dep.

58)  Wehling worked out of Trane's La Crosse, Wisconsin, location and

supervised Collier and Schaaf remotely.  (Id. 70-71.)

### 3.      Maria Blase's Plan to Consolidate

Maria Blase became Ingersoll Rand's Vice President of Finance for Climate

Solutions in October 2009.  (Blase Decl. ¶ 3.)  One of her first duties was to create

a plan for combining the finance functions of Ingersoll Rand's three subsidiaries:

Trane, Thermo King, and Hussmann.  (Id. ¶ 5.)  In early 2010, Blase and the rest

of Ingersoll Rand's Finance Leadership Team met to discuss the integration of

---

[1] Schaaf has also brought a lawsuit against Trane for discrimination, Schaaf v. Trane U.S., Inc., Civil File No. 12-2465 (MJD/FLN).  Collier relies on facts related to Schaaf's case to support Collier's claims.

the three finance departments.  (Id. ¶ 6.)  They decided that the organization

would operate more efficiently if the subsidiaries' FP&A departments were

headquartered in Davidson, North Carolina, with the rest of Ingersoll Rand's

leadership team.  (Id. ¶ 7.)  After the meeting, Blase decided to begin

consolidating the North America FP&A team in Davidson.  (Id. ¶ 8.)  In late 2010

or early 2011, Blase reviewed her consolidation decision with Steven Shawley,

Ingersoll Rand Senior Vice President and Chief Financial Officer and Rick Weller,

Vice President Controller, and received approval to move forward.  (Id. ¶ 9.)

In June 2011, Mark Majocha took over the position of Director of North

America Finance.  (Blase Decl. ¶ 12.)  Soon after Majocha took over, Blase told

him that she wanted to move quickly to consolidate the North American FP&A

team in Davidson.  (Id.)  As part of the consolidation process, Blase decided to

move the ISC FP&A leader and the Director of FP&A for Trane North America

positions to Davidson.  (Id. ¶ 14.)

On June 29, 2011, during Ingersoll Rand's annual Organization and

Leadership Review meeting, Blase discussed her plan to consolidate the North

America FP&A team in Davidson.  (Blase Decl. ¶¶ 10-11; Blase Decl., Ex. A,

Power Point: Organization & Leadership Review 2011-2012: CS Finance ("Power

Point") at 8 ("Minimize matrix and centralize NA FP&A.").)

### 4.    Kimberly Boettcher's Promotion

In 2011, Wehling left her job.  (Collier Dep. 79.)  In July 2011, Trane

promoted Kimberly Boettcher to be the North American ISC FP&A team leader,

and Boettcher began supervising Schaaf and Collier.  (Collier Dep. 79-80;

Boettcher Dep. 8-10.)  Boettcher had previously worked in Trane's La Crosse

location, but, when she accepted the finance manager position, Trane required

her to transfer to Davidson; she was told that this was because the goal for the

ISC FP&A team was that, at some point, it would be based in Davidson and that

positions not based in Davidson would be eliminated.  (Collier Dep. 82; Boettcher

Dep. 29-30; Blase Decl. ¶ 15.)

When Boettcher was hired, Majocha told her that the non-Davidson based,

St. Paul positions on her team would be eliminated.  (Boettcher Dep. 29, 57, 112.)

However, Boettcher testified that she was not informed that Trane was under

any financial constraints in her department that would require layoffs in 2011 or

2012.  (Id. 28-29.)  Until November 2011, Boettcher worked and supervised

Collier and Schaaf from La Crosse, as Wehling had done.  (Id. 30-31; Schaaf Dep.

76.)  She moved to Davidson on November 1, 2011.  (Boettcher Dep. 31.)

### 5.    Douglas Watson's Promotion

In August 2011, Majocha was promoted to Director of Finance, and

Douglas Watson became the new Director of FP&A for Trane North America.

(Watson Dep. 8; Watson Decl. ¶ 8.)  Majocha and Blase told Watson that Trane

would be consolidating the North American FP&A department in Davidson and

eliminating non-Davidson positions.  (Watson Decl. ¶ 8.)  Watson testified that,

as soon as he accepted his promotion in August 2011, Majocha told Watson to

centralize responsibilities in Davidson as much as possible.  (Watson Dep. 69.)

Trane already had "a critical mass in La Crosse, Wisconsin.  And we want to try

to build slowly a critical mass in Davidson.  [Majocha] began that process

because Kim Boettcher was already hired in to the FP&A lead and relocated to

Davidson in that capacity.  She was going to support Kevin R[oe]der and the

integrated supply chain.  So she was already the first piece of that.  So then the

next piece was to relocate those, the two positions, from St. Paul into Davidson as

well so that the team could be fully assembled in Davidson."  (Id. 69-70.)

Trane moved the Director of FP&A for Trane North America position to Davidson when Watson accepted the position.  (Blase Decl. ¶ 54; Watson Dep. 8-9.)  Watson supervised Boettcher.  (Watson Decl. ¶ 9.)

As Director of FP&A, Watson was responsible for four business units: ISC, distribution, equipment, and parts.  (Watson Dep. 44.)  As of July 2012, Watson directly supervised the four heads of these units and indirectly supervised the approximately nine members of their teams.  (Id. 9-13.)  FP&A employees from these units were located in St. Paul, Minnesota; La Crosse, Wisconsin; Clarksville, Tennessee; and Davidson, North Carolina.  (Watson Decl. ¶ 7.) According to Boettcher, the other financial analysts indirectly supervised by Watson in FP&A held positions that were interchangeable with one another in that an employee could go from one division to another.  (Boettcher Dep. 131-32.) According to Watson, each business stream is "very siloed."  (Watson Dep. 15.) He also testified that it would not be extraordinary for a financial analyst to move from one business stream to another.  (Id. 45-46, 48.)

In August 2011, Majocha and Watson decided to begin the consolidation process by eliminating the two St. Paul-based financial analyst positions on Boettcher's team because Boettcher and both of her supervisors, Watson and

Kevin Roeder, were located in Davidson.  (Blase Decl. ¶¶ 16-17; Watson Decl. ¶

13.)  The duties associated with those positions would be absorbed by existing

employees in Davidson.  (Watson Decl. ¶ 15.)  During the August 2011 time

period, Blase personally asked Watson to move forward on consolidation by

eliminating the St. Paul financial analyst positions.  (Blase Decl. ¶ 17.)  At the

time, in 2011, neither Watson nor Blase were aware that either Schaaf or Collier

had been, were, or would be taking Family and Medical Leave Act ("FMLA")

leave.  (Watson Dep. 83; Blase Decl. ¶ 18.)

### 6.    Schaaf's Diagnosis and FMLA Leave

In November 2010, Schaaf discovered a lump in her breast.  (Schaaf Dep.

83.)  She had a follow up in February 2011; on June 29, 2011, Schaaf learned that

she had breast cancer; and a mastectomy was scheduled for July 27, 2011.

(Schaaf Dep. 81-83, 170; Stadheim Decl., Ex. 7.)  On June 29, 2011, Schaaf did not

have a direct supervisor, so she reported her diagnosis to Susan Thomas.  (Schaaf

Dep. 170.)  On July 15, 2011, shortly after Schaaf learned that Boettcher would be

her ISC FP&A supervisor, Schaaf informed Boettcher that she had been

diagnosed with breast cancer and needed to take leave for surgery.  (Schaaf Dep.

81-82; Boettcher Dep. 61.)  In 2011, Schaaf was out for a period of time while she

received treatment for breast cancer.  (Collier Dep. 92.)  She returned to work on

August 24, 2011.  (Schaaf Dep. 105.)

### 7.   Collier's Job Performance and Desire to Relocate

In 2009, Collier received an "Exceeds Expectations" performance review

rating.  (Collier Dep. 74-75.)  In 2010 and 2011, she received a "Meets All

Expectations" rating.  (Id. 75, 85; Stadheim Decl., Ex. 1, 2011 Year End Review.)

Collier had always done her job well.  (Boettcher Dep. 74.)

In 2011, Collier told Boettcher that she was interested in relocating to

Davidson because she wanted to advance within Trane and Collier questioned

the stability of her position in St. Paul.  (Collier Dep. 87-88.)  During 2011 and

2012, Collier talked to Kevin Roeder multiple times about relocating to Davidson,

told him that she was willing to move to Davidson, and asked him about

Davidson Day School for her daughter.  (Collier Decl. ¶ 3.)

### 8.   J.P Rossi

In late 2011, Trane posted a financial analyst position based in North

Carolina for Boettcher's team.  (Boettcher Dep. 27-28, 113-14.)  In December 2011,

J.P Rossi applied for this financial analyst position.  (Boettcher Dep. 44, 114.)

Rossi was 24 years old at the time that he applied.  (Watson Decl. ¶ 21.)  He lived

in Davidson and was already working for Ingersoll Rand.  (Boettcher Dep. 50.)

Boettcher interviewed Rossi for the position.  (Boettcher Dep. 44.)  Rossi

had been selected for Ingersoll Rand's Accelerated Development Program

("ADP"), a competitive development program that allows high caliber

employees the opportunity to rotate through different positions within Ingersoll

Rand.  (Boettcher Dep. 50; Watson Dep. 53-54.)  While Rossi was in the ADP

program, he had worked as a cost accountant at a plant in Bridgeton, Missouri,

and had then moved to Davidson to work in both Ingersoll Rand's corporate

FP&A and internal audit departments.  (Boettcher Dep. 51; Watson Dep. 54.)

Boettcher was interested in Rossi because he was one of the top five graduates of

his ADP class and was highly recommended by another finance leader, Dusty

Muckenthaler, who had worked with Rossi at the Bridgeton plant.  (Boettcher

Dep. 53, 75.)  She also got positive feedback from other Ingersoll Rand employees

who had previously worked with Rossi.  (Id. 53-54.)

Boettcher's supervisor, Watson, did not interview Rossi but supported his

hire.  (Watson Dep. 65.)  Watson had met Rossi during a finance integration

training program that Rossi had attended and Watson had helped to develop.

10

(Id. 53.)  Watson also knew that Rossi had completed ADP training as "one of the stars of [his] class" and came highly referred from high level employees.  (Id. 55, 67-68.)

Boettcher and Watson decided to hire Rossi, although he did not have the five-to-seven years of related financial experience required in the job description.  (Boettcher Dep. 40-42, 75.)  Boettcher testified that experience requirements in Trane job descriptions are discretionary across the board.  (Id. 42-43.)  Rossi was hired in January 2012, and began working on Boettcher's team in late January or early February 2012.  (Id. 28, 72; Schaaf Dep. 159-60; Collier Dep. 91.)  During his first year of employment, Rossi received an "exceeds expectation" rating.  (Boettcher Dep. 34-35.)  Watson was not aware of Rossi having any disability or taking FMLA leave.  (Watson Dep. 69.)

### 9.    Collier's Diagnosis and Medical Leave

On February 2, 2012, Collier was diagnosed with low iron or anemia, and her physician recommended iron infusions to treat her condition.  (Collier Dep. 96-97.)  Collier testified that her anemia infusion treatments caused her headaches (Collier Dep. 134) and issues concentrating and focusing (id. 134-35).  She further testified that her anemia caused her extreme exhaustion (id. 157),

inability to care for hygiene by brushing her teeth and showering regularly (id.),

circulatory issues where her legs tingle and are in pain (id.), severe edema (id.),

severe constipation (id. 158), issues concentrating and focusing (id.), and a lifting

restriction of ten or fifteen pounds (id. 159).

Collier's medical providers recommended that Collier receive four iron

infusions, each one week apart, which she did on February 10, February 17,

February 24, and March 2, 2012.  (Collier Dep. 99-100, 103-04.)  She was also

advised to take oral iron tablets twice a day.  (Id. 99.)  Iron infusions were

completed at an IV infusion clinic.  (Id. 101.)

Because the iron infusions needed to be completed during the work day,

on February 2, 2012, or soon thereafter, Collier requested time off for her

infusions.  (Collier Dep. 105.)  First, she asked Boettcher if she should take PTO

for the time off for the treatments.  (Id. 106.)  Boettcher eventually told Collier

that Claudia Anderson, a human resources representative, instructed Collier to

request FMLA leave from Aon Hewitt ("Hewitt"), Ingersoll Rand's third-party

FMLA administrator.  (Collier Dep. 107-08.)  Collier requested FMLA leave from

Hewitt in early February 2012.  (Id. 105, 110.)  On February 28, Collier's medical

provider indicated on the FMLA certification that she needed leave for four

separate dates of three hours per week in February and March 2012.  (Id. 113;

Stadheim Decl., Ex. 3.)

On March 5, 2012, Collier's request for intermittent FMLA leave was

approved for February 1, 2012 to March 12, 2012, for three hours per week, as

requested in the physician's certification.  (Stadheim Decl., Ex. 3.)  However, on

March 28, Hewitt sent Collier a letter stating that her four absences on February

10, February 17, February 24, and March 2 had each exceeded three hours, so she

needed to fill out a recertification form.  (Id.)  On April 16, Hewitt denied her

FMLA on the grounds that Collier had not returned the FMLA certification form

sent to her on March 28.  (Id.)  After multiple communications, on June 21, 2012,

Hewitt approved Collier for intermittent FMLA leave from June 12, 2012 to

March 3, 2013.  (Id.)

After her last infusion on March 2, 2012, Collier did not need or request

additional FMLA leave for any future date.  (Collier Dep. 139-40.)  Boettcher

testified that she knew that Collier was taking time off in 2012 up to the time her

position was eliminated in July 2012, but that she did not know anything about

whether Collier was taking FMLA leave.  (Boettcher Dep. 92.)  Collier testified

that, as of July 2012, she did not know if she would need more infusions or

would simply continue taking oral iron supplements. (Collier Dep. 169-70.)  After

Collier was terminated in July 2012, her doctor decided that Collier did need

more iron infusions.  (Id.)

### 10.    Timing of the Decision to Terminate Schaaf and Collier

Watson opined that Trane management made the decision of when to

terminate Collier and Schaaf during the first quarter of 2012.  (Watson Dep. 85.)

Watson testified that Blase gave the directive to consolidate and to eliminate the

positions in St. Paul and, as far as how that was handled, he was the ultimate

decisionmaker.  (Id. 90-91.)

After Watson made the decision to proceed in terminating Schaaf and

Collier, he found out that Schaaf had been on FMLA, so he consulted with Dora

Miller to find out how to proceed with the terminations.  (Watson Dep. 86-87.)

Miller was an Ingersoll Rand Global Human Resources Manager who supported

the climate solutions finance and information technology departments.  (Miller

Dep. 10.)  Miller may have seen Schaaf and Collier's names on a docket of names

of employees in positions considered for reorganization in January 2012.  (Id. 23-

24.)  She first discussed the potential elimination of Schaaf and Collier's positions

at a March 2012 meeting with Boettcher and Watson.  (Id. 22-24.)  Miller

recognized that it was a "tough situation" with Schaaf because she had recently had cancer.  (Miller Dep. 24-25.)  They planned to move forward with the terminations by the end of March 2012.  (<u>Id.</u> 25.)

Also, Miller learned that Schaaf had taken or was taking FMLA leave and Collier might have a condition that might be "an FMLA condition," although none of them knew the specifics.  (<u>Id.</u> 29-30.)  Miller wanted to find out how many days were being used and how much time each employee had remaining under FMLA because she did not want to eliminate someone if she was still covered under the FMLA.  (<u>Id.</u> 26, 31-32.)  She testified that Collier's and Schaaf's FMLA leave was the "determining factor" in deciding whether to move forward with their terminations in that, if they were on FMLA leave, they would not be terminated at that time but, if they were not on FMLA leave, they would be terminated at that time.  (Miller Dep. 26, 93; Stadheim Decl., Ex. 12, April 30, 2012 Email Chain between Boettcher and Miller.)  Boettcher agreed that Trane had already made the decision to terminate Schaaf and Collier but had decided to wait to terminate Schaaf and Collier until they were both no longer on FMLA leave.  (Boettcher Dep. 128-29.)

Miller asked Boettcher for direction, but Boettcher had not been tracking Collier or Schaaf's time off.  (Miller Dep. 31.)  Miller asked local Human Resources for the FMLA leave information.  (Id. 31, 41-42.)  Anderson described the request as "a little unusual."  (Anderson Dep. 67.)  Anderson was not aware of such a request being made previously in the fourteen years she had been with Trane.  (Id. 6, 67)

Sometime in March 2012, Miller learned that both Collier and Schaaf might be on intermittent FMLA leave, so she advised Watson and Boettcher to delay terminating them.  (Miller Dep. 32-33.)  Watson retorted that he had a directive to move forward with the terminations.  (Id. 33.)

Miller continued to seek information regarding whether Schaaf and Collier were still using FMLA leave because she was getting "mixed messages as far as whether they were on FMLA or not on FMLA."  (Miller Dep. 71.)  On March 20, 2012, Anderson emailed Miller that Schaaf was not currently taking FMLA leave. (Stadheim Decl., Ex. 14, Mar. 20, 2012 Email from Anderson to Miller.)  On April 30, Boettcher emailed Miller and asked about the status of the situation with Collier and Schaaf, explaining, "Just curious where that piece stands because I know the FMLA situation adds some complexity."  (Stadheim Decl., Ex. 15, Apr.

16

30, 2012 Email from Boettcher to Miller.)  Boettcher meant that the legal

department and human resources department thought that the FMLA status was

important and that she assumed that the information would play into Trane's

decision on the timing of when to terminate Collier and Schaaf.  (Boettcher Dep.

117-18.)  Miller wrote back: "Are we ready to move? Tonda is the only person on

FMLA… unless something has changed.  I can have legal weigh in again, but it is

tough situation for a number of reasons.  Ultimately, Michael can only give us

advice.  We can do what we need."  (Stadheim Decl., Ex. 15.)

On May 1, Anderson asked Jennifer Hitchner of Trane Human Resource

Services, North America, for information on Schaaf's FMLA status by May 3.

(Stadheim Decl., Ex. 14.)  Also on May 1, Anderson asked Miller if she wanted

information on Collier and/or Schaaf's FMLA leave.  (Stadheim Decl., Ex. 16.)

Miller responded, "Yes, Susan.  Thanks for having my back!!"  (Id.)  On May 7,

Hitchner wrote that Schaaf's FMLA leave had ended on August 23, 2011; there

were no more FMLA claims after that date; and Schaaf's claim was closed.

(Stadheim Decl., Ex. 14.)

Watson testified that realizing that Schaaf and Collier had been on FMLA

"clearly delayed us from proceeding with the action, you know, really when we

would have like to have proceeded with it." (Watson Dep. 87.) Eventually,

Miller told Watson that everything was good from "an HR perspective or

whatever," and Watson and Boettcher decided that mid-July would be an

appropriate time to terminate Collier and Schaaf. (Watson Dep. 85-87, 110;

Boettcher Dep. 58.)

### 11.   Schaaf's and Collier's Terminations

On July 17, 2012, Boettcher and Anderson met with Schaaf in St. Paul and

told her that her position was being eliminated and consolidated in North

Carolina and her employment was terminated. (Boettcher Dep. 141; Stadheim

Decl., Ex. 17; Collier Dep. 147-48; Schaaf Dep. 10, 158.) During the meeting,

Schaaf asked why the company was eliminating the positions of the two women

who were over 45 and taking FMLA. (Stadheim Decl., Ex. 17; Anderson Dep.

75.) Anderson did not reply. (Anderson Dep. 75, 103-04.) Anderson testified

that, at that time, she knew that Schaaf was not on FMLA, and there was no

record that Schaaf was currently taking FMLA leave. (Id. 76.) Schaaf asked

Boettcher, "Why couldn't you have held off on this because I'm still going

through cancer treatment?" (Schaaf Dep. 167.) Boettcher responded, "It wasn't

my decision. I've been holding them off for six months." (Id. 167.) Boettcher

testified that no one sought out her advice on who to terminate.  (Boettcher Dep. 106.)

After Schaaf was terminated, she told Collier.  (Collier Dep. 146.)  Collier contacted a Thermo King employee about a possible open position for a supply chain analyst.  (Id.)  She did not hear back from him about the possible position and did not follow up.  (Id. 147.)

Later in the day on July 17, Boettcher and Anderson met with Collier in St. Paul and told her that her position was being eliminated and her team was being consolidated to Davidson.  (Stadheim Decl., Ex. 17; Collier Dep. 143; Boettcher Dep. 141; Anderson Dep. 74.)  Collier stated that she wanted to move to Davidson and would move herself, but Anderson told her that no relocation was available.  (Collier Dep. 140-43.)  Anderson told her that she was free to apply for open positions within Ingersoll Rand.  (Id. 144.)  Collier stated that she was on FMLA and neither Boettcher nor Anderson responded.  (Id. 170.)

### 12.    Events Following Collier's Termination

After Schaaf and Collier were terminated, Boettcher and Rossi absorbed their job duties.  (Boettcher Dep. 141-42.)  No one was hired to replace Collier or Schaaf.  (Id. 142, 146.)  Boettcher testified that Rossi's position was not eliminated

because it was located in Davidson, and the St. Paul positions were being eliminated and the team consolidated to Davidson.  (Id. 99-100.)

On August 6, 2012, Miller wrote to Kimberly Gerardi, Human Resources Director NA Service & Contracting and Global Controls Climate Solutions: "You're 'RIP' made me chuckle ;-)  Indeed, this will be an interesting one. Thanks!"  (Stadheim Decl., Ex. 18.)  Gerardi responded, "Yes, I saw that after I sent, LOL …..  I suspect this will be interesting BUT if neither were currently on FMLA and work is moving to Davidson should be clean…."  (Id.)

As of July 2012, Watson had four direct reports: Stephanie Smith, equipment FP&A leader, located in Minnesota; Boettcher, ISC FP&A leader, located in North Carolina; Matt Seiler, distribution FP&A leader, located in Wisconsin; and Nicole Metzler, parts FP&A leader, located in Wisconsin. (Watson Dep. 9-13, 17-18.)  Smith's direct reports were Berle Travis, located in Tennessee; and Adam Wohlwand, located in Wisconsin.  (Id. 10, 12-13.) Boettcher's direct reports were Collier, located in Minnesota; Schaaf, located in Minnesota; and Rossi, located in North Carolina.  (Id. 12-13, 18.)  Seiler's direct reports were Jessica Mueller, located in Wisconsin; Brent Gruaman, located in Wisconsin; and Beth Naaden, located in Minnesota.  (Id. 11-12, 18.)  Metzler's

direct report was Heather Mylrea, located in Wisconsin.  (Id. 10, 12-13, 18.)  As of

May 2013, apart from Boettcher's ISC FP&A team, all of Watson's other reporting

teams with his remaining direct and indirect reports continued to be located

outside of Davidson.  (Id. 18, 40.)  No other positions of employees working in St.

Paul under Watson, but not on Boettcher's ISC FP&A team, were moved to

Davidson.  (Id. 28.)  According to Schaaf, Schaaf and Collier were the only

employees under Watson "who had FMLA leave issues."  (Schaaf Dep. 120.)  A

new group was moved under Watson in 2013, and that team lead works in St.

Paul.  (Boettcher Dep. 148; Watson Dep. 9, 17.)  Neither Schaaf nor Collier was

ever offered the opportunity to relocate.  (Schaaf Dep. 136.)

### 13.    Beth Naaden

Beth Naaden was a Trane financial analyst working in St. Paul on Seiler's

distribution FP&A group.  (Schaaf Dep. 150-53; Watson Dep. 9-12, 15, 18, 76-77.)

She was on a performance improvement plan sometime between 2011 and July

17, 2012.  (Schaaf Dep. 150-53; Watson Dep. 76-77.)  In approximately May 2012,

Boettcher asked Collier and Schaaf about Naaden's behavior because Watson

planned to discuss the issues with Naaden.  (Schaaf Dep. 151-53.)  Watson

thought that Naaden "can be a drain on [the] productivity of other individuals"

because of "just talking and basically spending time where she [was] not performing."  (Watson Dep. 76.)  As far as Watson knows, Naaden does not suffer from any disabling condition and has not taken FMLA leave.  (Id. 78.)  Naaden was over forty years old.  (Schaaf Dep. 165.)

### 14.   Kevin Roeder

Kevin Roeder was a Trane finance leader based in Davidson in Operations FP&A, meaning that plant controllers reported to him.  (Collier Dep. 77-78; Schaaf Dep. 144-45; Watson Decl. ¶ 13.)  Boettcher supported Roeder.  (Watson Decl. ¶ 13; Schaaf Dep. 145; Boettcher Dep. 101, 147.)

Schaaf testified that Roeder was not her direct supervisor, may have input into her reviews but did not conduct her reviews, and did not give her a raise.  (Schaaf Dep. 145.)  Later, Schaaf executed a declaration averring that she reported to Roeder "through matrix," meaning a dotted line reporting for specific duties and projects, including biweekly forecasts, reporting of actual results, annual operating plan reporting, and headcount reporting.  (Schaaf Decl. ¶ 7.)  When Schaaf finished one of these projects, she would send her work product to Boettcher, her direct supervisor, and to Roeder.  (Id.)  Roeder would

review her work for approval.  (<u>Id.</u>)  Schaaf opines that Roeder had input into her

performance reviews.  (<u>Id.</u>; Schaaf Dep. 145.)

Collier avers that she directly reported to Roeder and Boettcher for all her

job duties.  (Collier Decl. ¶ 2.)  Roeder, alone, supervised her on the metal fix

program; warranty accrual; steel rebate analysis; purchase price variance

analysis; standards change adjustment; and direct materials productivity and

inflation reporting.  (<u>Id.</u>)  He gave final approval of these reports.  (<u>Id.</u>)  He also

had direct input on her 2011 performance review as a "matrix manager."  (<u>Id.</u>;

Stadheim Decl., Ex. 1.)

Collier testified regarding a "passing conversation with Kevin Roeder" in

April 2012, in which Roeder and Collier were discussing recent layoffs, and

Roeder told Collier that "[h]e should be looking for another position at Trane

and not be in that current position at that time much longer because he was

getting older because it was Ingersoll Rand policy to get rid of employees that

were older that had been in their position longer than two years.  Those were the

exact words."  (Collier Dep. 175-78.)  Collier told Schaaf and Melissa Zaleski, a

friend and supervisor of another team, about the statement.  (Collier Dep. 176-77,

179; Schaaf Dep. 144-46.)  Zaleski retorted, "I'm not surprised."  (Collier Dep.

179.)

### 15.    Alleged Comparators

Relying on Schaaf's deposition testimony and declaration, Collier asserts

that the following seven employees should be considered as comparators and

were allowed to stay in their current locations after site changes:

- April Wehling – In July 2011, she was allowed to stay in La Crosse, Wisconsin, after Boettcher took over her previous position and her promotion.

- Edgar Collado – was permitted to stay in Piscataway, New Jersey after shutdown of site.

- Sandy Collonello – was permitted to stay in Piscataway, New Jersey after shutdown of site.

- Angela Hindel – was permitted to stay in St. Louis after shutdown of site.

- Joe Schmitz – was permitted to stay in St. Paul and work remotely for a Davidson team.

- Mike Zaleski – asked to take a job in Davidson, but was permitted to stay in St. Paul after Trane created a new position for him.

- Mike Libnick – was asked to move to Davidson, but refused and was permitted to go to another Ingersoll Rand location in Indiana.

(Stadheim Decl., Ex. 19; Schaaf Dep. 172-74; Watson Dep. 22-24; Schaaf Decl. ¶ 6.)

Plaintiff does not provide support in the record for the positions of these seven

employees.  Based on Plaintiff's representation in her brief, only one was a

financial analyst and the other defined roles were leads, managers, or directors.

There is no evidence that any of the seven worked under Watson at the relevant

time.

Schaaf also testified that it appeared that Trane forced out a number of

employees in their fifties between 2010 and 2011.  (Schaaf Dep. 147-49.)

Specifically, she opined that Trane forced out Mark Ponton, Dave VanSloun, Pam

(last name not known) an IT Lead in St. Paul, and a male communications person

in St. Paul.  (Id.)  Schaaf claims that Trane said that their jobs were eliminated,

but it renamed the positions and other people then took those positions.  (Schaaf

Dep. 147-49.)  Plaintiff provides no other information on these employees'

positions, circumstances of their termination, specific ages, or on the employees

who took over their duties.

### B.    Procedural History

On September 5, 2012, Collier served a Complaint on Trane for a lawsuit

venued in Ramsey County District Court.  The Complaint alleges: Count 1:

Disability Discrimination in Violation of the Minnesota Human Rights Act

("MHRA"); Count 2: Age Discrimination in Violation of the MHRA; and Count 3: Violations of the FMLA.  On September 25, 2012, Trane removed the case to this Court based on both federal question and diversity jurisdiction.

Trane now moves for summary judgment on all claims against it.

## III.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### B.    MHRA Age Discrimination Claim

### 1.    Legal Standard for MHRA Age Discrimination

Under the MHRA, it is an unfair employment practice for an employer to

discharge an employee because of the employee's age.  Minn. Stat. § 363A.08,

subd. 2(2).  "Age discrimination claims under the [MHRA] are considered under

the same analysis as claims under the ADEA."  Chambers v. Metro. Prop. & Cas.

Ins. Co., 351 F.3d 848, 855 (8th Cir. 2003) (citation omitted).

A plaintiff may establish age discrimination by the direct method of proof

or the indirect method.  King v. United States, 553 F.3d 1156, 1160 (8th Cir. 2009).

The parties disagree regarding which method of proof should be employed here.

The Court concludes that, at a minimum, Collier's claim survives under the

indirect method of analysis.

### 2.    Indirect Evidence Standard

When there is no direct evidence of discrimination, the Court applies the

McDonnell Douglas burden-shifting framework to determine if Collier's age

discrimination claim survives summary judgment.  Riley v. Lance, Inc., 518 F.3d

996, 1000 (8th Cir. 2008).  First, Collier must "establish a prima facie case of

discrimination."  Id. (citation omitted).  If she meets that burden, the burden

shifts to Trane "to produce evidence that [Collier] was terminated for a

legitimate, nondiscriminatory reason." <u>Id.</u> (citation omitted).  If Trane offers

evidence of a legitimate, nondiscriminatory reason, the burden shifts back to

Collier to put forth evidence to prove that Trane's proffered explanation is a

pretext for unlawful discrimination.  <u>Id.</u>

To prove a prima facie case of age discrimination, Collier must satisfy the

following four elements: (1) at the time her employment was terminated, she was

a member of the protected class; (2) she was otherwise qualified for her position;

(3) she was discharged by Trane; and, (4) her termination occurred under

"circumstances giving rise to an inference of unlawful discrimination." <u>Riley</u>,

518 F.3d at 1000 (citation omitted).  Replacement by a substantially younger

person gives rise to the necessary inference of age discrimination.  <u>Id.</u>

### 3.    Prima Facie Case

The parties agree that Collier was a member of the protected age class, was

qualified for her job, and was terminated.  However, they disagree whether

Collier can meet the fourth element of the prima facie case.

The Court concludes that, viewing the evidence in the light most favorable

to Collier, she has established her prima facie case by showing that her

termination occurred under circumstances giving rise to an inference of unlawful

discrimination.  In this analysis, the Court also considers evidence regarding

Trane's treatment of Schaaf.  See Estes v. Dick Smith Ford, Inc., 856 F.2d 1097,

1103 (8th Cir. 1988) (noting that "unflattering testimony about the employer's

history and work practices" "may be critical for the jury's assessment of whether

a given employer was more likely than not to have acted from an unlawful

motive"), overruled in part on other grounds by Price Waterhouse v. Hopkins,

490 U.S. 228 (1989).

First, Collier points to the comment by Roeder.  According to Collier,

Roeder was one of her direct supervisors; she reported to Roeder and Boettcher

for all job duties and, in several areas, Roeder, alone, supervised Collier's work.

Roeder provided feedback on Collier's 2011 performance review.  Finally, Roeder

was one of the business leaders that Boettcher, the leader of Collier's ISC FP&A

team, supported.  In April 2012, Roeder told Collier that it was Trane's policy to

terminate older employees who have been in the same position for more than

two years.  Collier told another supervisor, Zaleski, about this comment and

Zaleski stated, "I'm not surprised."  This evidence supports Collier's assertion

that Trane terminated her due to age-based animus.

Second, Collier points to Trane's treatment of Rossi.  In January 2012, 24-year-old Rossi was hired as the third member of Boettcher's team.  Rossi had less experience on Boettcher's team, and in the financial field in general, than Collier or Schaaf, who were both over 40 years old, yet his position was the only one that was not eliminated.  Although Trane asserts that Rossi was hired and not terminated based on his location in North Carolina, Collier has provided evidence that she sought a transfer to North Carolina, herself, and that Trane was aware of her desire to relocate.  Collier has provided evidence that her position, Schaaf's position, and Rossi's position were interchangeable, and he was hired shortly before both Collier and Schaaf were eliminated, at a time when Trane already planned to eliminate the St. Paul positions on the ISC FP&A team.  Viewing the evidence in the light most favorable to Collier, this situation is akin to the situation in which an age discrimination plaintiff is terminated and replaced with a substantially younger employee, a situation which is sufficient to establish the fourth prong of the prima facie case.  See, e.g., Riley, 518 F.3d at 1000.

### 4. Legitimate, Nondiscriminatory Reason

Trane has articulated a legitimate, nondiscriminatory reason for terminating Collier's position: it eliminated all non-North-Carolina-based positions on the ISC FP&A team to consolidate that team in North Carolina, where Boettcher, the team leader, was located.

### 5. Pretext

The Court holds that, viewing the evidence in the light most favorable to Collier, she has put forth sufficient evidence showing that Trane's proffered explanation is a pretext for unlawful discrimination.  As discussed with regard to the fourth prong of the prima facie case, there is evidence of age-based animus in the form of Roeder's comment in April 2012.  Although Trane claims that Collier was terminated solely because it desired to consolidate Boettcher's team in North Carolina, a jury could find this explanation specious given that Collier sought to transfer to North Carolina and Trane was aware of this desire yet, instead of transferring Collier or Schaaf, Trane hired a much younger employee to do the same work at the same time that it had decided to terminate Schaaf and Collier, both of whom Trane knew to be significantly older than Rossi.  Taking the record

as a whole, Collier has provided sufficient evidence of pretext. Summary

judgment is denied.

### C. FMLA Claims

#### 1. FMLA Standard

The FMLA provides eligible employees up to 12 weeks of unpaid leave

during any 12-month period if, among other things, they have a serious health

condition that makes them unable to perform the functions of their position. 29

U.S.C. § 2612(a)(1)(D).

> Two subsections of the statute establish prohibited acts. Section
> 2615(a)(1) makes it unlawful for an employer to "interfere with,
> restrain, or deny the exercise of or the attempt to exercise" rights
> provided under the FMLA. The Act also makes it unlawful for "any
> employer to discharge or in any other manner discriminate against
> any individual for opposing any practice made unlawful" by the
> FMLA. 29 U.S.C. § 2615(a)(2).

Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1005 (8th Cir. 2012).

The Eighth Circuit recognizes three types of claims arising under the two

subsections. The first type of claim is an entitlement claim, which "occurs where

an employer refuses to authorize leave under the FMLA or takes other action to

avoid responsibilities under the Act." Id. Collier admits that she "eventually

received all FMLA leave she was entitled." (Opp. Brief at 31.) Thus, she does not

allege an entitlement claim. See Brown v. City of Jacksonville, 711 F.3d 883, 891

(8th Cir. 2013).  The second type of claim is a retaliation claim, which occurs when "an employee opposes any practice made unlawful under the FMLA" and the employer "for that reason take[s] adverse action against the employee who is engaged in opposition."  Pulczinski, 691 F.3d at 1006.  The third type of claim is a discrimination claim, which occurs "when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA."  Id.  Whether Collier's claim is styled as a retaliation claim or a discrimination claim, she must show "proof of the employer's discriminatory intent."  Brown, 711 F.3d at 891.  The claim can be proven under the direct evidence or McDonnell Douglas indirect evidence standard.  Id.

> Absent direct evidence, [Collier]'s FMLA retaliation [or discrimination] claims are evaluated under the McDonnell Douglas burden-shifting framework.  To establish a prima facie case, [Collier] must show that 1) [s]he engaged in protected conduct; 2) [s]he suffered a materially adverse employment action; and 3) the materially adverse action was causally linked to the protected conduct.  If [Collier] establishes a prima facie case, the burden shifts to [Trane] to promulgate a non-discriminatory, legitimate justification for its conduct, and then back to [Collier] to either introduce evidence to rebut the employer's justification as a pretext for discrimination, or introduce additional evidence proving actual discrimination.

Chappell v. Bilco Co., 675 F.3d 1110, 1116-17 (8th Cir. 2012) (citations omitted).

Here, Plaintiff argues that her claim survives under both the direct and indirect method.  The Court concludes that there is no direct evidence of FMLA retaliation here.  "[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004) (citation omitted).  Direct evidence is evidence "of conduct or statements by persons involved in the decision-making process, which indicate a discriminatory attitude was more likely than not a motivating factor in the employer's decision."  Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1046 (8th Cir. 2005).  Although Plaintiff cites to testimony and emails from Trane witnesses that FMLA leave was considered in making the decision as to the timing of Collier's and Schaaf's termination, those statements  uniformly provided that FMLA leave was a factor in delaying the timing of the terminations, not that it was a factor in the decision to terminate.  These comments are not negative remarks about the use of FMLA leave.  This testimony is not direct evidence of discriminatory intent.  The Court will analyze Collier's claim under the indirect method.

### 2.      Exercise of Rights Under the FMLA

The parties agree that Collier exercised her rights under the FMLA.

### 3.      Adverse Employment Action

The parties agree that Collier suffered an adverse employment action

when she was terminated.

### 4.      Causal Connection

The fact that 1) Schaaf and Collier were the only members of the ISC FP&A

team to be terminated and the only two who were using or had recently used

FMLA leave, and 2) Schaaf and Collier were the only employees under Watson

to be terminated at that time and the only two who were using or had recently

used FMLA leave, "is certainly not conclusive evidence of [] discrimination in

itself, but it is surely the kind of fact which could cause a reasonable trier of fact

to raise an eyebrow, and proceed to assess the employer's explanation for this

outcome." MacDissi v. Valmont Indus., Inc., 856 F.2d 1054, 1058 (8th Cir. 1988).

See also Lewis v. Aerospace Cmty. Credit Union, 114 F.3d 745, 748 (8th Cir.

1997).  Therefore, the Court proceeds to the next step of the McDonnell Douglas

analysis.

### 5. Legitimate, Nondiscriminatory Reason

Trane has articulated a legitimate, nondiscriminatory reason for

terminating Collier's position: it eliminated all non-North-Carolina-based

positions on the ISC FP&A team to consolidate that team in North Carolina,

where Boettcher, the team leader, was located.

### 6. Pretext

The Court concludes that Collier cannot provide sufficient evidence of

pretext to survive summary judgment on her FMLA claim.  Although the

statistical evidence that Collier and Schaaf were the only employees taking or

recently taking FMLA leave and the only employees terminated from Boettcher's

team and from the group of employees under Watson may be sufficient to meet

the prima facie case, more is needed to show pretext.  See, e.g., Lewis, 114 F.3d at

749-50.  The Court has examined, as a whole, all of the arguments that Collier

offers regarding pretext and concludes that she cannot meet her burden.

Although the Court has considered all of her arguments and evidence as a whole

and in context, the Court now addresses each type of evidence offered by Collier

in turn.

### a) Comments Regarding FMLA Leave and Leave Tracking

36

Unlike Plaintiff's age discrimination claim, the FMLA claim is not

supported by any comment tending to show animus.  The Trane witness

comments to which Plaintiff points regarding FMLA leave all provide that

Watson, Boettcher, and Trane Human Resources were attempting to treat Collier

and Schaaf better if they were still on FMLA leave than if they were not still

using FMLA leave by delaying the termination until after Collier and Schaaf

were done with FMLA leave.  Miller testified that whether or not Schaaf and

Collier were on FMLA leave would be "a determining factor for [her] on whether

or not [Trane] would want to move forward with them being reduced."  (Miller

Dep. 93.)  Boettcher testified that Schaaf's and Collier's FMLA leaves played a

role in the timing of when their terminations would occur.  (Boettcher Dep. 118.)

Miller's and Boettcher's testimony is consistent with Watson's testimony that

Trane "delayed" terminating Collier and Schaaf because "it doesn't feel right" to

terminate someone while she is on leave, and Plaintiffs' FMLA use "clearly

delayed us from proceeding with the action . . . really when we would have liked

to have proceeded with it." (Watson Dep. 86-87.)  After Watson, Boettcher, and

Miller met regarding terminating Collier and Schaaf, the evidence is

uncontradicted that Trane began to track Collier and Schaaf's FMLA leave in an

effort to avoid terminating them while they were still using FMLA leave. Plaintiff points to no authority that it is unlawful for an employer to delay a previously planned termination because an employee took or is taking FMLA leave. Viewing the Trane witnesses' testimony and emails in the light most favorable to Collier, there is no indication of retaliatory or discriminatory animus in the comments.

### b)   Rossi

In the context of Collier's age discrimination claim, the Court relied in part on Collier's evidence that she wanted to be transferred to Davidson and yet Trane hired a new younger employee, Rossi, for the Davidson position instead of transferring Collier, all the while knowing that it was planning to eliminate Collier's position. Rossi was not using FMLA. However, this evidence does not support Collier's FMLA retaliation claim because, according to Collier, Rossi was hired for the Davidson position before Collier was diagnosed with acute anemia, before she knew that she would need FMLA leave, and before she requested FMLA leave from Trane. She cannot argue that Trane's decision to hire Rossi instead of transferring her was based on her use of FMLA leave.

### c)   Timing

"Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999).  Here, Collier requested FMLA leave from Trane on February 2, 2012, and she took FMLA leave four times between February 10, 2012 and March 2, 2012.  She did not know that she would need to take time for more transfusions until after her termination.  She was terminated on July 17, 2012, five months after she first requested FMLA leave.  The relevant date for an FMLA retaliation claim is "the date an employer knew of an employee's use (or planned use) of FMLA leave, not the date it ended." Sisk v. Picture People, Inc., 669 F.3d 896, 900 (8th Cir. 2012).  Five months is too long a time period to establish a causal connection. See, e.g., Sisk, 669 F.3d at 900-01 (holding that two-month time period is too long to establish causal connection without "something more").

### d)    Issues with Hewitt

Collier claims that pretext can be shown based on issues that she had with Hewitt's administration of her FMLA leaves.  On March 5, 2012, Hewitt promptly approved Collier's FMLA leave after receiving her February 28, 2012

medical certification.  (Stadheim Decl., Ex. 3.)  It then requested recertification

when the actual leave times taken for the infusions exceeded the amounts

requested in the certification.  (Id.)  There was back and forth throughout April,

May, and June 2012, until Hewitt received a new certification, dated June 15,

2012, that met its criteria.  (Id.)  On June 21, 2012, Hewitt certified Collier for her

requested intermittent leave to March 3, 2013.  (Id.)  Collier received all FMLA

leave that she requested and was entitled to receive.  Hewitt promptly approved

her leaves once certification was received.  Her interaction with Hewitt is not

evidence of pretext by Trane.

### e)    Comparator Evidence

Collier further argues that a jury could find pretext because, besides the

ISC FP&A team, no other teams under Watson have been consolidated to

Davidson, and all FP&A employees outside of Davidson who report to Watson

kept their jobs in their current locations.  She asserts that, looking at the entire

group of employees who reported to Watson, Schaaf and Collier were the only

two employees terminated and were the only two employees using FMLA.

Trane witness testimony is consistent that the ISC FP&A team was being

consolidated to Davidson, a decision made before Collier was diagnosed with

acute anemia.  Boettcher was required to relocate to Davidson, Rossi was hired in

Davidson, and both Schaaf and Collier's St. Paul positions were eliminated and

not replaced.  To date, the Trane ISC FP&A team remains consolidated in

Davidson.  No other Trane employee was on the ISC FP&A team.  Collier and

Schaaf's work duties were absorbed by Boettcher and Rossi, the remaining

members of the ISC FP&A team, and no other employees under Watson took on

those duties.  (Boettcher Dep. 142.)  The other financial analyst employees who

indirectly reported to Watson, such as Naaden, were on different teams with

different supervisors who, unlike Boettcher, were not located in Davidson.

Collier also notes that seven other finance employees, who were not

supervised by Boettcher or Watson at the relevant times, were allowed to keep

their positions in their original locations even after site closures.  The seven

finance employees permitted to keep their jobs after a site closure cannot

constitute valid comparators.  There is no evidence that any of these employees

were supervised by Boettcher or Watson at the time they were permitted to

remain in their original locations.  All but one held entirely different jobs that

Plaintiff, and most were management-level employees.  No information is

provided regarding whether those employees used FMLA.

Viewing all of the evidence as a whole, there is not evidence from which a reasonable fact finder could find pretext.  Trane is entitled to summary judgment on the FMLA claim.

### D.    MHRA Disability Discrimination Claim

#### 1.    Legal Standard for MHRA Disability Discrimination

Generally, a disability discrimination claim under the MHRA is analyzed in the same manner as a claim under the ADA.  Kobus v. Coll. of St. Scholastica, Inc., 608 F.3d 1034, 1038 (8th Cir. 2010).  As with Collier's age discrimination claim, she can prove her claim under the direct evidence framework or the McDonnell Douglas burden-shifting framework.  See Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1044 (8th Cir. 2005).  Because there is no direct evidence of disability discrimination, the Court proceeds under the indirect analysis.

To establish a prima facie case of disability discrimination, "an employee must show that she (1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment decision because of the disability."  Kallail v. Alliant Energy Corp. Servs., Inc., 691 F.3d 925, 930 (8th Cir. 2012).

## 2.     Whether Collier Was Disabled

"Disability" means any condition or characteristic that renders a
person a disabled person. A disabled person is any person who (1)
has a physical, sensory, or mental impairment which materially
limits one or more major life activities; (2) has a record of such an
impairment; or (3) is regarded as having such an impairment.

Minn. Stat. § 363A.03, subd. 12. "The degree to which a condition limits one or

more major life activities is evaluated based on the plaintiff's specific

circumstances." Hoover v. Norwest Private Mortg. Banking, 632 N.W.2d 534,

543 (Minn. 2001).

Trane admits that Collier suffers from anemia, but argues that she does not

suffer from a disability. The Court holds that there is a genuine question of

material fact regarding whether Collier is disabled. Collier asserts that her

anemia caused concentration and focus issues, extreme exhaustion, hygiene

issues such as not brushing her teeth or showering regularly, circulatory issues,

digestive issues such as severe constipation, and lifting restrictions. She has

presented evidence that her anemia affects her digestive and circulatory systems

in a chronic and substantial manner, and that it prevents her from performing

basic hygiene. These symptoms fall under the ADA definition of "major life

activities," which include "caring for oneself," "concentrating," and "the

operation of a major bodily function, including but not limited to, functions of

43

the . . . digestive . . . [and] circulatory . . . functions."  42 U.S.C. § 12102(2)(A), (B).

Furthermore, at this stage, the absence of expert testimony to substantiate

Collier's disability claim is not dispositive.  See Butt v. Greenbelt Home Care

Agency, No. C01–0152–LRR, 2003 WL 685026, at *14 n.7 (N.D. Iowa Feb. 28, 2003)

(gathering cases).

### 3.    Whether Collier Was a Qualified Individual

The parties agree that Collier was a qualified individual.

### 4.    Adverse Action

The parties agree that Collier suffered an adverse action when she was

terminated.

### 5.    Causal Connection

As the Court explained with regard to Collier's FMLA claim, the fact that

1) Schaaf and Collier were the only members of the ISC FP&A team to be

terminated and the only two who had a disability, and 2) Schaaf and Collier were

the only employees under Watson to be terminated at that time and the only two

known to have a disability, "is certainly not conclusive evidence of []

discrimination in itself, but it is surely the kind of fact which could cause a

reasonable trier of fact to raise an eyebrow, and proceed to assess the employer's

explanation for this outcome." MacDissi v. Valmont Indus., Inc., 856 F.2d 1054, 1058 (8th Cir. 1988). See also Lewis v. Aerospace Cmty. Credit Union, 114 F.3d 745, 748 (8th Cir. 1997). Therefore, the Court proceeds to the next step of the McDonnell Douglas analysis.

## 6. Legitimate, Nondiscriminatory Reason

Trane has articulated a legitimate, nondiscriminatory reason for terminating Collier's position: it eliminated all non-North-Carolina-based positions on the ISC FP&A team to consolidate that team in North Carolina, where Boettcher, the team leader, was located.

## 7. Pretext

The Court concludes that Collier cannot provide sufficient evidence of pretext to survive summary judgment on her disability discrimination claim. Although the statistical evidence that Collier and Schaaf were the only employees with a disability and the only employees terminated from Boettcher's team and from the group of employees under Watson may be sufficient to meet the prima facie case, more is needed to show pretext. See, e.g., Lewis, 114 F.3d at 749-50. The Court has examined, as a whole, all of the arguments that Collier offers regarding pretext and concludes that she cannot meet her burden. As with

Collier's FMLA claim, there is no evidence of negative comments regarding her

disability.  Additionally, Rossi was hired for the Davidson position before Collier

was diagnosed with acute anemia.  As the Court explained with regard to the

FMLA claim, Collier informed Trane of her anemia five months before she was

discharged.  Collier's interactions with Hewitt do not support an inference of

disability discrimination.  Finally, Collier cannot show any similarly situated

comparators to support a finding of pretext.  Viewing all of the evidence as a

whole, there is not evidence from which a reasonable fact finder could find

pretext.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

Defendant's Motion for Summary Judgment [Docket No. 10] is
**DENIED IN PART** and **GRANTED IN PART** as follows: Count 1:
Disability Discrimination in Violation of the MHRA, and Count 3:
Violations of the FMLA are **DISMISSED**, and Count 2: Age
Discrimination in Violation of the MHRA, **REMAINS**.


Dated:   April 21, 2014                    Michael J. Davis
                                           Michael J. Davis
                                           Chief Judge
                                           United States District Court